AMERICAN SHEET & TIN PLATE CO. v. PITTSBURGH & L. E. R. CO.

PITTSBURGH & L. E. R. CO. v. AMERICAN SHEET & TIN PLATE CO.

(Circuit Court of Appeals, Third Circuit. January 30, 1906.)

No. 57.

1. TORTS—INJURY TO PROPERTY—INTERFERENCE WITH FIREMEN BY RAILROAD TRAIN.

While railroad trains must be run in a city with reasonable regard to the right of public firemen, as well as private citizens properly so engaged, to. enter upon and cross with their apparatus the railroad track in order to put out a fire, a railroad company, in the regular operation of its road, cannot be held liable for loss resulting from what turns out to be an interfering use of its own property, unless it is actually notified or informed of the conditions which made such use an interfering one. To be a ground of liability such interfering use must be a willful one, or due to a failure to exercise due care.

2. SAME—FAILURE TO STOP TRAIN—KNOWLEDGE OF FIRE.

A railroad company cannot be held liable for a loss resulting from a fire in a city at night because one of its freight trains ran between the place from which firemen and others were preparing to run hose across the tracks to the burning building, even though the trainmen were signaled to stop by persons beside the track, where the fire was not visible to them, there was no hose upon the track which they should have seen,

and it is not shown that they heard or understood the signals, or knew or should have known of the existence of a fire.

3. SAME.

The engineer of a freight train on defendant's railroad, entering the city of Pittsburgh at night, stopped his train in compliance with a signal given by a person alongside the track, and was told that a building was on fire a very short distance ahead and that firemen were about to run a hose across the track. He could not quickly nor safely back nor cut his train because of another following close behind, and, after being told the situation, he at once pulled ahead and past the fire as rapidly as possible. It appeared that in doing so he exercised his best judgment, and acted promptly, and there was no evidence that he acted in willful or wanton disregard of the rights of others. *Held*, that the interference with the operations of the firemen by the passing of the train, under such circumstances, did not render defendant liable to the owner of the burning property.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Thomas Patterson, for plaintiff.

A. Leo Weil, for defendant.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. The case in the court below was an action brought by the American Sheet & Tin Plate Company against the Pittsburgh & Lake Erie Railroad Company, to recover damages to the property of the firm, which was destroyed by fire on the night of January 27, 1904. The case was submitted to the jury, and from the judgment entered upon a verdict in favor of the plaintiff, writs of error were sued out by both plaintiff and defendant. Assignments of error have been filed in both cases, and the same were separately argued before us.

The property known as the Monongahela plant of the Tin Plate Company, was situated on the south side of the city of Pittsburgh, bounded on the north by the Monongahela river, and on the east by South Sixteenth street. The right of way of the defendant railroad company, running east and west, bounds a portion of the property on the south, and extends through a portion of the property, towards Sixteenth street, a portion of the property lying south of the railroad, and having upon it some of the mills of the plaintiff company. The buildings, however, that were burned, were situated upon that portion of the property which lay between the railroad and the river; the distance between the tracks and river being about 300 feet. Near the railroad, south of it, and parallel thereto, was Muriel street, and back of Muriel street, and parallel to it, a square away, was Carson street. Sixteenth street crossed the railroad at right angles, and extended to the river. So, also, did Thirteenth street. The so-called Fifteenth street crossing was a way maintained by the company across the tracks of the railway company, on the line of what was formerly Fifteenth street, but for a long time abandoned as a city street.

On January 27, 1904, at about 10 o'clock in the evening, a fire broke out at the plaintiff's said plant in the oil house thereof, which is located on the portion of plaintiff's property lying between said rail-

road and the river.  An alarm of fire was at once sent to the public fire department of the city of Pittsburgh, which responded promptly, so that, in a few minutes thereafter, a fire company of said department arrived at the plant of the company, with their apparatus and hose, at or near the so-called Fifteenth street crossing, and shortly thereafter, another company with their hose arrived at or near the Thirteenth street crossing.  The firemen and others at said Fifteenth street crossing, had laid the hose through the "hot mills" of the plaintiff company, on the south side of the railroad, and were preparing to lay it across the track of the company, for the purpose of conveying water to the fire, when a locomotive, with a freight train attached, of the defendant corporation, was seen approaching from the west, below Thirteenth street.  There is the testimony of three or four witnesses that they ran toward the approaching train, signaling it to stop, by waving their hands or hats; one witness saying that he seized a lantern from a switch block, and waved that, going towards the approaching train.  There is also testimony that some of these signals were given before the engine passed Thirteenth street.  There is some conflict of testimony as to how these signals were given, and as to whether the lantern signal was given to the train first approaching, or to one that afterwards followed it, and as to which no complaint is made.  However, for the purposes of the case, as we view it, it must be conceded that attempts to signal the train were made in the way described.  In the cab of the engine were the engineer, fireman, and head brakeman of the train, which was a long one. These men all testify that they neither heard nor saw any signals, as described by plaintiff's witnesses, saw no fire on plaintiff's premises, and neither heard nor saw anything that would suggest to them that such a fire existed, and that they were absolutely without information in regard thereto.  It is in testimony that the engineman of the company that first arrived at the Fifteenth street crossing, inquired of the plaintiff company's employés, where the fire was, and, although they were looking for a fire, as it was their duty to look, they saw nothing to direct them, but a reflection upon the surface of the river.  It was in testimony that owing to the glare of the furnaces in the works along the bank of the river, at night, reflections on and illuminations of the surface of the same were of frequent occurrence; that along the right of way of the railroad company, owing to the number of men employed in the various industries of that locality, there were persons constantly passing to and fro, which, together with the noise of the mills, created much confusion along the route occupied by the right of way of the railroad company. Just before the engine arrived at the Fifteenth street crossing, the engineer testifies that he saw for the first time, by the light from the furnace, the door of which had just been opened, a man running alongside of the engine, and signaling him to stop; that he at once applied the emergency brakes, and stopped the train within a few car lengths, but not until the engine, by the momentum of the train, had passed the Fifteenth street crossing.  The testimony of the  fireman and brakeman corroborates that of the engineer, as to this being the first signal or warning observed by any of them,

and they all testify that they did not then know that the signal was given because of a fire, but supposed that some one had been run over.

After the train was at length stopped in the manner just described, there is conflict of testimony as to what occurred between the engineer, who was in control of the train, and the employés and others who spoke to him in regard to the fire. The night superintendent of the works testifies that he informed the engineer of the existence of the fire and of the necessity of putting the hose across the track, and asked that he would back his train away from the crossing, or cut it and pull out, so as to clear the same; that the engineer did not answer him, but turned around at last and said, "Pull out," ignoring his remonstrance regarding the time required to pull the entire train out, and the danger resulting therefrom. He testifies that from the time the engine stopped until it started again was about 2 or 2½ minutes. On the other hand, the engineer testifies that after he had put on the emergency brake, thinking that some one had been run over, and had stopped the train, he got down to the ground, and there met a man whom he did not know, but who is now identified as Marshall, the night superintendent, who said, " 'Back up! back up!' I said 'What is the matter?' He says, 'A fire.' I said, 'I can't back up, but I'll cut, or do whatever you want.' He said, 'If you can't back up, get out of here,' so I got up on the engine, on the right side, and started." He says he started the engine as fast as he could, in order to get out of the way, and ran past a red block, between Twenty-Second and Thirty-Fourth streets, as he knew that if he stopped then his train would still obstruct the crossing at Fifteenth street. He therefore told the fireman to take the engine down to the mouth of the tunnel, and stop; he getting off in order to wait for a white block and then walk up. In this he is fully corroborated by the fireman. He testifies, also, and the fact is not disputed, that another freight train was following close behind, and this seems to have put it out of the question, that he should have backed the train, when requested so to do. He further testifies that when he stopped his engine near the Fifteenth street crossing, he did not see any fire, and there is no evidence that at that time it was flagrant. The fireman, who heard the conversation between the engineer and Marshall, says that the engineer said, "I can't back up until my flag goes out; there is another train following me close," and that he said, "I will cut the train for you," but that Marshall said, "No, that will take too long; go ahead and get out of here"; that he then asked if there was any hose on the track, and he said, "No." The brakeman, who was in the cab and was also present at the conversation between the engineer and Marshall, testifies:

"When I got off the engine, there was a man standing there, and he said, 'Back up! back up!' and about that time the engineer was on the ground. I says, 'we can't back up; there is another train following us close.' The engineer started around the front end of the engine, and I followed him around, and also had a conversation with a man on the right side of the engine, and he wanted us to back up. The engineer said we could not; there was a train following us close, but he would cut the train. He said, 'That will take too long; go ahead and get out of here,' and he got on the engine and went."

Bosler, a disinterested witness, a brakeman of the Allegheny & South Side Railroad, who was present at the time of the fire, saw the defendant's train coming from Thirteenth street, "using steam," and as he was walking up toward the Fifteenth street crossing, he met a fireman, and told him that he "had better flag this engine, or he will come by you"; that "the fireman ran down and caught him about 60 feet this side of Fifteenth street, and flagged him. He got on the Whitehall track, and ran alongside the engine. He did not get in front of the engine. The emergency brake was put on as quick as he was flagged." He walked up around the engine and saw a gentleman with glasses on, superintendent of the Tin Plate Company, and heard him ask the engineer if he could not back up. The engineer told him he could not, as there was a train following him close; that the flagman would not have time to get back. He said, "I will cut them for you." The superintendent said, "That will take too long." "The very words he used, 'Get to hell out of here.' The engineer then said 'Is there any hose laid?' He said 'No,' and the engineer got up on his engine and pulled out."

These are the essential portions of the evidence upon which the court was asked to charge the jury that, under all the evidence, their verdict should be for the defendant; the refusal of which request by the court is assigned for error. It is also the ground for the motion made by defendant's counsel, for judgment, non obstante veredicto, upon the whole record, under authority of an act of the General Assembly of the state of Pennsylvania, approved April 22, 1905, authorizing such a motion, and appeals from the judgment so entered, and the entry of the proper judgment by the appellate courts.

It is not denied that a natural person, or a corporation by its corporate agencies, may so interfere with the rights of another, growing out of the emergency of a fire or conflagration, of or on such other person's property or premises, as to make him or it liable for injury and damage directly resulting from such interference. Actionable interference of this kind is the violation of a fundamental social duty, and is within the definition of a common-law tort. Private property may be entered by the public authorities, or by the person, or his agents, who is owner of a burning property, for the purpose of using reasonable means to save the same or extinguish the fire, and undoubtedly in the case now before us, the plaintiff's employés, as well as the public firemen, had the right to cross the right of way and tracks of the defendant company, for the purpose of leading the hose from the source of supply to the burning buildings. In such a case, the exclusive control of private property is subordinate to the exigencies of public safety and private necessity, and legal sanction is given in such a case to the requirements of morality and social duty. That right, however, is not in question here. The questions with which we are here concerned, are:

(1) Whether the defendant was guilty of conduct, amounting to a tort, in not stopping its train that was traversing its own right of way and tracks, unless informed in some manner that the property in question was burning, and in danger of being destroyed, and that the

train, by proceeding, would interfere with the efforts being made to save the same.

(2) Whether, after the train had been stopped and, so far as the testimony shows, those conducting it were for the first time informed of the existence of the fire, and that it was necessary that the hose should be laid across the track, the defendant can be held responsible as for a tort, because the engineer, in the exercise of his best judgment, under the circumstances, decided to go ahead, and pull the train as quickly as possible past the crossing, instead of either backing it or cutting it.

As to the first question, we have to remark that we accept the broad proposition, which counsel for defendant in error says is the basic principle on which the case was tried in the court below, that trains must be run with reasonable regard to the right of public firemen, as well as private citizens properly so engaged, to enter upon and cross, with their apparatus, a railroad track within the city of Pittsburgh, in order to put out a conflagration. But it is neither sound law nor good morals, that a railroad company, in the regular operation of its road, should be held liable for loss resulting from, what turns out to be, an interfering use of its own property, unless it is actually notified or informed of the conditions which make such use an interfering one. To be a ground of liability, such interfering use must be a willful one. Conflagrations along the right of way of a railroad company are not of such frequent occurrence as to make them, as it were, normal conditions surrounding the running of its trains. Such conditions are exceptional, and actual knowledge of the same must be affirmatively shown before liability can be predicated thereon. Not only must the knowledge be brought home to those in charge of the train, that a fire is in existence near its right of way, but also, that the running of a train past it, or the stopping of one in front of it, will interfere with the work of extinguishment, and increase the public or private danger. Moreover, the use of the property of a railroad company, is a quasi public use, and the proper operation and running of its trains, in the interest of the public and for the promotion of its safety, are required to be conducted with regularity upon prearranged plans and schedules. It would be intolerable and unjust, if railroad companies were compelled, at their peril, to stop trains, whether passenger or freight, every time an unauthorized signal was given them so to do, or even every time those conducting them were aware that a fire existed along their route, whether from personal observation or from information thereof otherwise conveyed, unless there was reason also to know that, by keeping on, they would interfere with means used and efforts made for the extinguishment thereof. They would have no right to run across hose, observed, or which ought to have been observed, lying across the tracks for the purpose of extinguishing a fire, and they must be held to the duty of exercising due care in proceeding, where a fire is visible near their route, or where they have information otherwise that it exists; but in all cases, knowledge of the conditions from which the exigency arises, or facts from which it may be imputed, must be shown before liability for not acting in accordance with such exigency, can attach.

In the case before us, not only is it not shown that those who were in the cab of the engine saw, or could have seen, the fire in question, or that they were otherwise informed of its existence, but it is not affirmatively shown that the signals said to be given as the train approached were seen or heard by those in the engine cab, much less understood by them. It is undisputed that at the time the engine passed between Thirteenth and Fifteenth street crossings no fire was visible or flagrant, so as to attract attention. It had not yet progressed to that stage. But, conceding that the signals made by the waving of hands or hats, ought to have been seen, there was nothing in the situation to connect them with the existence of a fire, and we cannot impute knowledge to those on the engine, not only of the hands being waved along the side of the track, on a dark night, but also knowledge of the intent with which such signals were given. This is the essence of the tort charged, and the presumption of innocence to which the defendant is entitled must be overcome by evidence sufficient for that purpose. That plaintiff understood the only ground upon which liability of the defendant could be predicated, is shown by the averment in the declaration or statement of claim, not only that signals were given, but that the trainmen "saw and understood" said signals. There is no evidence at all, of the truth of this necessary averment of fact, certainly none "of such a character that it would warrant the jury to proceed in finding a verdict" in favor of the plaintiff. It is always the duty of the trial court to decide, "whether, conceding to all the evidence offered the greatest probative force, which, according to the law of evidence, it is entitled to, it is sufficient to justify a verdict." Commissioners, etc., v. Clark, 94 U. S. 284, 24 L. Ed. 59; Pleasants v. Fant, 22 Wall. 121, 22 L. Ed. 780.

The signals testified to were not the authorized railroad signals by which the movements of trains are controlled, and we are not prepared to go so far as to say that defendant is obliged, at its peril, without regard to circumstances, to stop its trains whenever such unauthorized signals are given. We have carefully read the cases on this point referred to by counsel for the plaintiff below. We do not, however, think that any of them controvert the principle which governs our decision in this case; i. e., that it must be shown, that those conducting the train knew, or ought to have known, what the situation was, in order to make the otherwise regular running of the train an unlawful interference with plaintiff's right.

Metallic Comp. Casting Co. v. Pittsburgh R. R. Co., 109 Mass. 277, 12 Am. Rep. 689, cited by counsel for defendant in error, and apparently much relied upon, was tort against a railroad corporation, for negligently severing a hose, which was laid across their track in Somerville, and thereby cutting off the supply of water to a fire which was consuming plaintiff's factory. Chapman, Chief Justice, in stating the facts of the case, says:

"At that time, a freight train came along from the west, and though its managers had sufficient notice and warning, and might have stopped, and had no occasion for haste, they paid no attention to the hose, but carelessly passed over it with their train, and thereby severed it and stopped the water. * * * They did not delay to give time for uncoupling the hose which would have delayed them but a few minutes."

The case then goes off upon the right to lay the hose across the defendant's tracks, which is not here denied, and upon other points not involved in the case at bar.

Inhabitants of Hyde Park v. Gay, 120 Mass. 593, turned upon a peculiar question of Massachusetts law not here involved. The case was tort for running over a discharging fire hose laid across a railroad track. The closing paragraph of the short opinion by Colt, J., shows the special point upon which this case turned:

"To the defendant's objection that the jury was permitted to find for the plaintiff, although the managers of the train were free from any fault, except that of running a train on Sunday, it is sufficient to say that the instructions given, plainly required the jury to find, that the act of running the train on the Lord's Day, was the distinctive and direct cause of the injury complained of, and this is enough to support the action."

In Mott v. Hudson River R. R. Co., 1 Rob. (N. Y.) 585, it appears that a freight train, upon the defendant's tracks when approaching a fire in New York City, was fully informed of the existence of the fire, and slowed down accordingly, but it nevertheless ran over hose laid across the track, in full view and after full warning. In that case, of course, the defendant company was properly held liable.

So in Traction Electric Co. v. McCaskill, Supreme Court of Arkansas, 86 S. W. 997, a fire in a city was burning brightly in the nighttime. The street along which the trolley cars ran, was brilliantly illuminated from the burning building, which was nearby. A hose four or five inches in diameter, in plain sight, was stretched across the track. A car of the appellant company ran over the hose and cut it. The court said:

"There was no reason why the motorman could not have seen it for a long distance. He denies seeing the hose, but tells of watching the fire when he came near it."

This is a clear case where, with full information as to the situation, the defendant's conductor so carelessly ran his car, as to do the damage in question. We are of opinion, therefore, as to the first question, that there is no evidence in this case, sufficient to require the same to be submitted to the jury, that defendant's servants were in any manner informed of the existence of the fire on plaintiff's property, or had any notion, from observation, or otherwise, of a situation which required them to stop, or demanded extra caution on their part, until after the stoppage of the train at or near the Fifteenth street crossing.

This brings us to the second question; that is, whether, after the train had been stopped, there was anything in the conduct of those managing it, to render defendant liable for the loss occasioned by the fire. After what has been already said, it must be taken as true, in considering this question, that those who were on the engine had no information as to the existence of the fire, until after the engine had been stopped in the manner described.

There is no evidence of anything said or done by the engineer, after he was informed of the situation, or those with him, which shows wanton or willful disregard of the rights of the plaintiff, as is charged

in the declaration. The situation depicted by the testimony, was one requiring from the engineer the prompt exercise of his best judgment as to how he should proceed. Conceding, as we must for our purpose, that all the testimony be taken most strongly against the defendant, it results simply in this: That the engineer, after being informed of the fire, and consulting with those interested in its extinguishment, decided that he would neither back nor cut the train, but would pull out as promptly as he could. This decision was arrived at and carried into execution promptly; only 2½ minutes having elapsed, according to the plaintiff's witness, the superintendent of the works, from the stopping of the engine until he had started to go ahead again. His refusal to adopt either of the two other courses said to have been proposed to him by the superintendent, viz., to back his train or to cut it, was not an arbitrary and wanton refusal, but one founded upon reasons, which may well have been, under the circumstances, properly controlling. It is admitted that another freight train was closely following the one in question, and to have backed, would have required the precaution of flagging for a considerable distance from the rear of the last car. The time necessarily required for this operation, might well have appeared to the engineer as long as that required to pull the train past the scene of the fire, besides being an operation involving more or less danger in its execution. To have cut the train at Fifteenth street and at Thirteenth street, would also have involved the flagging of the train, to prevent a collision, as also it would have occupied considerable time, not only in pulling the cars apart at two points, but in disconnecting the air brake system with which the train was equipped. To pursue this course, also involved danger, not only of collision by the following train, but a danger from exposure of the cars, and their freight, left standing upon the track, to a fire which might become a conflagration. Looking at all the evidence, we cannot see but that, under the circumstances, the decision of the engineer to pull out was a wise and prudent one. However that may be, he executed it promptly, and by his conduct in running past a red block signal to the tunnel, he showed an appreciation of the situation, and a desire to avoid, as far as possible, interference with the work of extinguishing the fire. He was confronted by a situation which demanded prompt action, not only with reference to the burning property of the plaintiff, but with reference to the preservation and safeguarding of the valuable property under his charge. Defendant cannot be held liable for the consequences of an honest, though mistaken judgment in such an emergency. There was no "willful and wanton refusal," as necessarily averred in the declaration, to do or to refrain from doing something, the doing of which, or refraining from which, necessarily interfered with plaintiff's use of appropriate means to protect his property. In this case defendant's servants acted promptly in removing the obstruction caused by the train; the only charge being that they might have removed it in a different way, more to the advantage of the plaintiff. It is not clear to us that this is so, but if that were clearly established, we would still be of the

opinion that there was no evidence in the case upon which a jury could have properly proceeded to find a verdict for the plaintiff.

For these reasons, we think the jury should have been instructed to render a verdict in favor of the defendant. Also, that the motion made by defendant's counsel, under authority of the act of the General Assembly of the state of Pennsylvania, of April 22, 1905, for judgment non obstante veredicto upon the whole record, should have been granted. The judgment below is therefore reversed, with directions to the court below to enter judgment in favor of the defendant.

The decision arrived at in this case, renders it unnecessary that we should consider the writ of error sued out by the American Sheet & Tin Plate Company against the Pittsburgh & Lake Erie Railroad Company, and the same is hereby dismissed.