WILLIAM G. McADOO, Director General of
Railroads,

*vs.*

T. LITTLETON HANWAY et al., Co-Partners,
Trading as Hanway & Gibson.

*Action Against Railroad—Cutting of Fire Hose by Train—
Negligence of Employees—Instructions—Evidence.*

A railroad company is liable in damages if its servants, with knowledge that a hose had been stretched across its tracks for the purpose of extinguishing a fire, willfully or negligently ran its train across the hose, with the result that, the hose being thereby cut, the fire was not extinguished.          pp. 660, 661

In an action against a railroad company for the cutting of a fire hose by a train, *held* that there was evidence sufficient to go to the jury that enough water could have been obtained from the plug to which the hose was attached to have extinguished the fire, which had just caught upon the plaintiff's building at the time the hose was cut, and also sufficient evidence to go to the jury that plaintiff was prevented by the cutting of the hose from getting sufficient water to extinguish the fire.          p. 671

That enough water might have been obtained from plugs on the same side of the track as plaintiff's building was not sufficient to defeat a recovery by plaintiff, some of the plugs on that side having been found to be frozen, and those not frozen being overlooked or not examined under the stress of circumstances.
          p. 671

Evidence that defendant's station agent had notice of the placing of the hose across the track in time to stop the train before reaching the point where the hose was laid, *held* sufficient to go to the jury.          p. 672

An instruction, requested by defendant, that the jury could not find for plaintiff unless they found that the engineer of the

train was notified of the placing of the hose across the track, was properly refused, it ignoring the evidence that the station agent had such notice. p. 673

An instruction, requested by defendant, that the jury must find for defendant if they found that no notice of the hose across the track had been given to those charged with the management of trains, was properly refused, as it might have misled the jury into believing that those referred to were those operating the train only, and that it did not include the station agent, who testified that he had nothing to do with the management of trains. p. 673

A prayer cannot be held bad on appeal under a general exception thereto because it assumes a fact. p. 674

In an action against a railroad company for the cutting of a fire hose by its train, thus causing the destruction of plaintiff's building, it was proper to allow a witness to testify as to a conversation with defendant's station agent at the time of the fire, by which it appeared that the agent knew of the intention to put the hose across the track, and in which he stated that he had taken precautions to prevent the cutting of the hose by defendant's trains. p. 675

In an action against a railroad company for the cutting of a fire hose by its train, where a witness, asked whether there would be any reason for defendant's station agent saying that he had notified the railroad "except that he saw that you were about to put a hose across the track and of sending a man each way to stop the train," the answer of the witness that "he did not see us putting the hose across the track at the time he told me" could not have harmed defendant. p. 675

An answer by the same witness, to a question as to the purpose of sending men up and down the track, "for protection to keep the train from cutting the hose if a train came along" cannot have injured defendant. p. 675

A witness having been asked what reason defendant's station agent could have had in notifying the witness not to send men up and down the track with lanterns, his answer "I don't know what reason he would have for it," cannot have injured defendant. p. 675

In an action against a railroad company, based on its train having cut a fire hose, with the alleged result that plaintiff's building was destroyed, evidence was properly admitted as to the supply of water obtainable from the water supply system of the town, including the plug to which was attached the hose cut by the train.                                                   p. 676

A witness for defendant having been asked how the heat was in the vicinity of plaintiff's building, his answer that "it was the heat which set the building on fire," disclosed an immaterial fact, and the court's action in striking it out is not cause for complaint.                                                            p. 676

*Decided January 16th, 1920.*

Appeal from the Circuit Court for Harford County (HARLAN, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Thomas H. Robinson,* for the appellant.

*John L. G. Lee,* with whom was *Septimus Davis* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The suit in this case was brought in the Circuit Court for Harford County by the appellees to recover from the appellant, the Director General of Railroads, the value of their stock of goods in the storehouse at Aberdeen, in said county, that was destroyed by fire on the 5th of February, 1918.

The plaintiffs alleged in their declaration that they were engaged in the general mercantile business and had at the time of the fire a large stock of goods and merchandise in the

storehouse occupied by them at the southwest corner of Front street and Belair avenue in said town and county; that said store was located about three hundred and fifty feet from the track of the Philadelphia, Baltimore and Washington Railroad Company, which road runs through the town of Aberdeen, and at such time was managed and operated by the defendant.

It further alleges that on the 5th day of February

"there was a fire raging in said town of Aberdeen, and when said fire reached a point at the northwest corner of said Front street and Bel Air avenue, and was burning the building there located, the plaintiffs had secured a hose of the volunteer fire company of said town of Aberdeen which they had connected with a fireplug which was part of the water system of said town of Aberdeen on the southeast side and across the tracks of the said railroad managed and operated by said defendant, as aforesaid, from the building of the plaintiffs, and that said hose was stretched across the tracks of said railroad, in the public street crossing said tracks, and the water had just begun to run through said hose from said fireplug on to the building in which was located the said store goods of the plaintiffs, which said water was sufficient in volume to extinguish the flames about then catching the said building, when a train managed and operated by the defendant, willfully, maliciously and negligently driven by his servants, ran over and cut said hose and shut off from the plaintiffs their supply of water; that the plaintiffs at once spliced said hose, when a second time a train, managed and operated as aforesaid, and driven as aforesaid, ran over and cut said hose; that the plaintiffs were thereby deprived of the water to fight said fire, so that the said store and the contents belonging to said plaintiffs were burned to the ground and were a total loss; that the defendant and its servants were notified of said fire in time to stop the said trains, but willfully, maliciously and negligently, as above set forth, and regardless of the rights of the

plaintiffs, failed to stop the said trains; that if said hose had not been cut, as aforesaid, and the defendant had used due care and diligence and stopped the said trains, the store goods of the plaintiffs, of great value, would not have been burned and lost to the plaintiffs."

The defendant demurred to the declaration. The demurrer was overruled and the defendant filed his plea that he did not commit the wrong alleged.

The case was then heard by a jury in said Court, which rendered a verdict in favor of the plaintiffs, and upon that verdict a judgment was entered. It is from that judgment this appeal is taken.

We will first consider the action of the Court in its ruling on the demurrer.

In the case of the *Metallic Compression Casting Co.* v. *Fitchburg R. R. Co.,* 109 Mass. 277, the facts are quite similar to those in the case before us. It was necessary in that case to lay a hose across the railroad in order to obtain an available supply of water to throw upon the burning building. The water from the hose was applied to the fire and it had diminished and would probably have extinguished it, but servants of the railroad company ran a train over the hose, and severed it, and thereby cut off the water from the fire, which then consumed the building. They had notice about the hose, and might have stopped the train to permit the hose to be uncoupled.

In that case, quoting from the syllabus, which seems to state correctly what was decided therein, the Court held in an action brought by the owner of the building against the railroad corporation "that the firemen had a right at common law to lay the hose across the railroad; * * * that the severing of the hose was the approximate cause of the destruction of the building and that the defendants were liable for the negligence of their servants in severing the hose."

In *Shearman & Redfield on Negligence,* Vol. 2, Section 464, it is said that the railroad company is liable for injuries

to property so caused, where it is seasonably warned to stop its train but fails to do so.

In *Concordia Fire Insurance Co.* v. *Simmons Co.*, 167 Wis. 541, where the defendant, a private corporation, in driving piles for a building, negligently pierced the intake pipe, thereby rendering useless the city's water work's system, and building of the plaintiff was burned, because of a lack of water to extinguish the fire, it was said, "if it shall appear from the evidence, that defendant's negligence so interfered with or interrupted the service which the municipality had been rendering, and was ready and willing on its part to continue to render, to the householder whose house was destroyed by fire, that it could properly be held the proximate cause of the loss of the dwelling, we see no reason why the defendant should not respond in damages."

In *Louisville & Nashville R. R. Co.* v. *Scruggs*, 161 Ala. 97, 23 L. R. A. (N. S.) 184, the Court said: "If the fire hose had been laid from the hydrant, across the tracks of the defendant, to the fire, and the defendant's servants, with knowledge of the existing conditions as to the fire and the laying of the hose, had wilfully or negligently run the train of cars over the hose, destroying it, and thereby prevented the extinguishing of the fire, a legal liability for such conduct would have arisen." See also the cases of *American Sheet & Tin Plate Co.* v. *Pittsburg & Lake Erie R. R. Co.*, 75 C. C. A. 47, 143 Fed. 789; *Little Rock Traction & Electric Co.* v. *McCaskill*, 75 Ark. 133, 70 L. R. A. 680; *Atkinson* v. *Newcastle & Gateshead Water Works Co.*, L. R. 6 Exch. 404.

Upon the principles contained in the authorities cited, the allegations in the plaintiffs' declaration, if true, are sufficient to render the defendant liable for the loss and injury complained of. Consequently the Court acted properly in overruling the demurrer.

At the conclusion of the testimony, the Court granted the plaintiffs' second and fifth prayers as offered, and after modi-

fication granted their first prayer. The defendant offered six prayers. The first, second, third, fourth and sixth were refused. His fifth prayer was granted, as modified.

We will next consider the action of the Court in its ruling upon the prayers.

The Court was asked by defendant's first prayer to instruct the jury that under the pleadings in the case there was no evidence legally sufficient to entitle the plaintiffs to recover.

The property of the plaintiffs was located in the storehouse occupied by them, situated at the corner of Belair avenue and front street, in the town of Aberdeen, and was about three hundred feet on the northeast side of the defendant's road, which passed, as we have said, through the town. On the morning of February 5th, 1918, it was extremely cold, the temperature being below zero. The fire which started about 4.30 o'clock in the morning in a building to the north of the storehouse containing plaintiffs' property, soon became a general conflagration. There were a number of fire plugs both on the north and south side of the tracks of the defendant's road. It was discovered that a number, if not all, of those on the north side of the tracks were frozen and from which no water could be obtained until they were thawed out by building-fires around them. It was because of this condition, as disclosed by the evidence in the case, that those managing the fire determined to cross to the south of the railroad to ascertain if water could be procured from the plugs on that side of the tracks with which to extinguish the fire. The first one, the one nearest to the tracks, was also found to be frozen. It was discovered, however, that the next one in point of distance from the tracks and from the storehouse of the plaintiffs was not frozen and the hose was attached to that plug, which was known as the Adams' Plug, and carried across the tracks. It was this hose that was cut by the next southbound train that reached Aberdeen at 5.33 in the morning. The cut portions of the hose were removed and the hose again adjusted to the plug when it was cut the second

time by another southbound train arriving at Aberdeen at 6.12 A. M.

It is claimed by the defendant that this case should not have been submitted to the jury because of a want of legally sufficient evidence to show: (1) That a sufficient quantity of water could have been obtained from the Adams' plug to extinguish the fire in its advanced state at the time the hose was adjusted to the plug; (2) Or at any other time that morning; (3) That the plaintiffs were prevented by the cutting of the hose from getting a sufficient amount of water to extinguish the fire when there were other plugs in the town upon the same side of the road as the store property; (4) That notice was given to the defendant's agent at Aberdeen or to the engineers or conductors in charge of the trains arriving at Aberdeen at 5.33 and 6.12 on the morning of the fire of the placing of the hose across the track or any intention of so doing in time to have stopped the said trains.

Harry F. Strasbaugh, a canner of Aberdeen, testified that on the morning of February 5th, he was awakened by the alarm of fire. "When he got to the fire Mr. Tarring's store and Mr. Adams' store were on fire, they were about 100 feet from Mr. Hanway's store on Belair avenue; that seven buildings were burned, and it was quite a big fire. He saw the Tarring and Adams places burning. Mr. Silver's place was next to Adams, and it caught fire and burned. The next place was the Odd Fellows' Hall. It was on the *southwest* corner of Belair avenue and Front street; that Mr. Hanway's building was located on the *southeast* corner directly across Front street, that Front street is not over thirty feet wide. * * * The public square or park is across from the Hanway's store on Belair avenue. Mr. Hanway's building was not burned when I got there, it had not caught fire. *Witness* saw it catch fire, but could not state the exact hour; that the railroad crossing is about 300 feet from the Hanway store." The witness, in speaking of the fire plugs, said: "the two plugs immediately in front of the Odd Fellows

Hall were frozen, it took some time to thaw one of them out;
the other we did not thaw out until later in the morning;
because we could not get water from the nearby plugs, I sug-
gested to my son to go across the railroad tracks and try the
plugs across the railroad to see if they were frozen. The first
plug was frozen. * * * My son called back to me that he
could not open it. I said try the other one in front of the
Adams' house; he called to me and said we have water here,
bring the hose down. We immediately rushed the hose car-
riage down as quickly as possible."

Witness further testified that while the hose was being at-
tached to the plug, just before or at the time of stretching
the hose over the track, he procured two red lanterns. One
he directed to be carried up the track to flag the southbound
trains and the other down the track to flag the northbound
trains, so they could be stopped before reaching the crossing
and before cutting the hose. He says that when he gave those
directions, Mr. Pritchard, the station agent of the defend-
ant's road at Aberdeen, was standing nearby and he said to
witness, as he understood him, "it is not necessary to send a
lantern up the track, I have notified the tower that there is
a fire at Aberdeen and stop all trains." When the hose was
connected and stretched across the track to or near the Han-
way store, he called to his son to turn on the water. This he
did, and it was discovered that the hose had a leaky joint.
The water was then turned off and the leaky section removed
and the water again turned on, when it was cut off by the
northbound train reaching Aberdeen at 5.33 o'clock. The
hose was again adjusted to the plug and was again cut by the
train from the north, arriving at Aberdeen at 6.12 o'clock.
After that time, witness knew little of what was done with
the hose that was attached to the Adams' plug. The plug in
front of the Methodist Church was then open and that plug
with the Berman plug were the only ones used. The back
part of the Hanway storehouse, consisted in part of a shed,
running near or along Front street. Mr. Strasbaugh thought

it was about twenty minutes past five, when the Hanway storehouse caught fire, although he says that he did not look at his watch when he so fixed the time. He first saw the shed afire. At that time the hose was attached to the Adams plug. He was then asked: Q. At the time it was attached you were at the Hanway store or down at the railway crossing? A. Part of the time at one place or at the other. He further testified that then the plugs to the north of the railroad, at least some of them, were used upon other buildings upon that side of the road in an attempt to extinguish the fire or prevent it from spreading. After the Berman and Church plugs were opened, he thinks all three plugs were for a while being used, but in a short while the Adams plug was abandoned and the other two plugs alone were used. He was then asked: Q. Using the plugs at the Church corner and the Berman store affected the force of the water in the plug between it and the Adams house? A. Yes, quite naturally. Q. It diminished the force of the water until it was regarded as impracticable to use it? A. I could not say that. I am not prepared to testify one way or the other in regard to that. I have no knowledge? Q. You do not know whether the water coming through there was coming with any force or not? A. It came with considerable force. Witness testified, it was about, as he thought, 5.20 o'clock when the hose was first cut. He did not think it could be much later than that from the fact that "it was 5 minutes after 5 when we took the hose down, then there was a leaky joint that we fixed in 5 minutes, probably not more than 3 or 4 minutes to connect it up, there were only two joints to unscrew." Q. When you say it was 5.20, it may have been 5.25 or 5.30? A. The time I mention was the time it seemed to me, and soon after we fixed the joint the train came along and cut it in two. Q. When you went up to the fire, where was the fire at that time, with reference to Hanway's store? A. The Hanway store had not caught. It had just about caught after the hose was cut."

George A. Mitchell, foreman of Hose Company No. 1, testified that at the time of the fire they had plenty of hose but the difficulty was in getting the plugs to work, that is getting water from the plugs, as many of them were frozen. He worked in front of the Hanway storehouse and saw it when it caught fire. It caught on or near the eaves and the blaze was, as he said, about "18 inches to a foot wide" when the hose attached to the plug across the railroad was ready to play upon the fire; that the hose was soon cut and the water stopped; that they spliced it and the water came through the hose when it was again cut by another southbound train. He was asked: Q. You say the other plugs were frozen up. After you got them thawed out and got the hose attached, where did you take the hose, what building did you go on? A. We played the upper one at Park street on the Ivins Drug Store and the one at Berman's we played on Mr. Hanway's store and over on the building adjoining him. Q. Not on the store proper? A. No, on the building where the restaurant is now. Q. How much water did you have? A. We had plenty of water, all that we wanted. Q. What time was it when the hose was put across the railroad track? A. I judge along about ten or twenty minutes after 5 o'clock. The Berman plug, he thought, was opened about six o'clock.

Harry E. Aaronson, a member of the volunteer fire company, testified that on the morning of February 5th, he was called at twenty minutes after four and went up after the hose. He tried to get water out of the plugs but they were frozen. They tried the plug in front of the Odd Fellows' Hall. The fire at that time was at Mr. Adams' meat store, about 100 feet from the hall. "We tried several plugs around there, before we could get water. When we could not get any water, we went below the railroad. We found a water plug not frozen up at Will Adams' and we attached the hose on to it. That was about 5 o'clock or a little after. * * * I saw Mr. Pritchard before that and saw Mr. Strasbaugh. Q.

What was Mr. Strasbaugh doing there? A. He was working trying to find fire plugs and trying to get the hose out and also trying to get some lanterns. Q. What did he want with the lanterns? A. He wanted to send them up and down the track to flag trains. Q. Did you hear the conversation between him and Mr. Strasbaugh? A. Yes. Q. Tell the Court and jury what it was. A. I heard Mr. Pritchard tell Mr. Strasbaugh to go ahead, as he had notified the towers, and Mr. Strasbaugh said 'go ahead,' and by that I went across the railroad track with the hose. Mr. Pritchard was ten or fifteen feet away when he was talking. I could not say whether he saw me stretch the hose across the track. Q. Did you get any water in the hose? A. When we connected the hose up and turned it on there was a leak and we had to shut it off and connect it up with another piece of hose on it. After we connected it up and had just turned the water on, it was just running in when it was cut in two by a train coming south. Q. Where were you when it was cut? A. I was 20 feet, I will say 30 feet from where it was cut. He again connected it with the plug and as he says "we had a good flow of water when it was cut in two again," by a south-bound train. Q. When the train acutally cut it in two, did you see the hose? A. Yes, I was standing close to it when they cut it the second time; it burst within five feet of me and it covered me with water; it was pretty cold. Q. There was such a pressure in the hose when the train cut it that it burst * * * and the water squirted over you? A. Yes. Q. How much, could you tell? A. Not exactly, but I know I was pretty well drenched.

W. Walter Hartzell, who was at the fire, testified that when the hose attached to the Adams plug was stretched across the road to the scene of the fire at Hanway's store, there was a little blaze in the end of the store house, "a foot or 18 inches, a couple of buckets of water would have put it out." He also testified to the hose being cut twice while connected to the Adams plug.

William Berman testified that the plugs were frozen and
they could not get water from them, that he went to the cross-
ing where they were stretching the hose across the road. He
doesn't remember seeing Mr. Strasbaugh there, although
there were quite a few men down there. "Mr. Bonnett
handed me a lantern, a red railroad lantern. Q. What did
you do? A. Came on down the track. Q. For what pur-
pose? A. To stop the train. I went north towards Havre
de Grace. Q. Did the train come up? A. Yes. Q. How
far up there did you get? A. I went up the railroad track
past Mr. Strasbaugh's canning house and was walking back
and forth; I do not know whether I came clean to the watch-
box or not; I went down in the neighborhood of 500 feet of
the crossing when the train came." He then testified that he
stood on the south track and flagged the train but, "it kept
on coming." He was not sure that this was the first or last
train that cut the hose.

Adam Bonnett, a resident of Aberdeen and passenger con-
ductor on the Proving Ground train, testified that he had
been for six years telegraph operator for the Pennsylvania
Railroad Company. He said that when he went to the scene
of the fire he found the plugs in the vicinity of the fire frozen.
He thereafter went to the crossing, where they were about to
stretch the hose across the railroad tracks and he suggested
they had better send a red lantern up the track to flag the
train to keep it from cutting the hose. He obtained a lan-
tern from the switchman at the crossing and gave it to Ber-
man and told him to go north on the track and flag the train,
as they were going to put the hose across the crossing. "As
I handed him the red lantern, Mr. Pritchard hollered at me.
He called me by name, saying that he did not think it was
any use sending a red lantern up the track as he had notified
the dispatcher that there was a fire in Aberdeen and for the
trains to look out for the fire at Aberdeen." He then called
to Mr. Berman that he need not go up the track with the red
lantern, that the dispatcher was to notify the trains about the

fire. He then helped with the hose cart, and when the hose was carried in front of Hanway's store, he with John Tarring attached the nozzle to the hose. They held the nozzle waiting for the water to come. He said the water was coming because they could feel it in the hose. "If you have a piece of hose stretched along the street, when the water commences to come through it, you feel air coming through there and the water jumping as it comes along for a distance." At this time he also heard the train coming. He could not see it. It was too far away at that time. The water did not come through the hose, "it did not get to the end of the nozzle," when the hose was cut by the train. He was then asked: "Q. Did you see the hose playing on Ivins' drug store later? A. Yes. Q. How much of a stream was coming through the hose? A. It had a right good force of water at that time."

John G. Tarring testified that he lived in Aberdeen, was in the mercantile business with his father, and that he and Bonnett held the nozzle of the hose at the time it was cut by the train and that he "could feel the water coming through the hose by the air. We were looking for the water at any second to come out. I happened to look down the track and saw a train coming. It was this train that cut the hose." He was then asked: "Q. What was the condition of Mr. Hanway's building and the fire at the time when you had the nozzle? A. I could have put it out with two or three buckets of water." He afterwards saw the stream playing upon the Evans' building and he said, "there was plenty of water coming out of it." He also testified that after the hose was cut, he went to the crossing "and there was water over the ground there, water had gotten up that far."

Pritchard, the station agent at Aberdeen, when placed upon the stand by the defendant, denied that he had the conversation with Strasbaugh, testified to by Strasbaugh and others. He said that "he noticed some confusion and some men around the crossing, which was about two hundred feet

from the station, and he went there and saw Mr. Strasbaugh
and others. Mr. Strasbaugh "made some remark about their
going to lay some hose across the crossing and what we would
do about trains. I told him that the only way to stop nearby
trains was men with red lights. He said, I have sent men
each way with red lights." This, he said, was the first that
he had heard of their intention to put the hose across the
tracks. He further testified that he had given no notice to
any one "had no reason to give anybody any notice," as he
"had no knowledge that they would put hose across the track."
From there he went towards the station. He did not go
down the track but went a roundabout way. "Went up there
around the hedge." "The train passed going south by the
time I got halfway there." This was the train reaching
Aberdeen at 5:33." On cross-examination he was asked: "Q.
You told him (Mr. Strasbaugh) in answer to his request or
mention of the hose across the track, that you would go down
and notify the towers, you told him that? A. I mentioned
I would do that. Q. You started off to do it? A. Yes. Q.
You did not do it, did you? A. Yes. Q. No, you called up
the dispatcher and asked him to get you an engine so that
you could get the cars out? A. I did not say that, I said I
called the operator at Oakington and told him that there was
a fire; before I finished talking to him, he put me on to the
dispatcher." He then testified that the engine was at Aber-
deen within not over five or six minutes from the time he
dispatched for it. "Q. If you had gone into your station
and called up the tower and told them to stop the train, you
had plenty of time to stop the second train? A. I do not
know how long it took me to get the tower, you cannot al-
ways get the line."

William J. Bonnett, employed by the defendant's road
as a telegrapher at Oakington, which is between Aberdeen
and Havre de Grace, testified that he was not notified of the
hose being placed across the track at Aberdeen. Upon cross-
examination he was asked: "Q. If you had information of

a hose across a track, you would not stop a train for it? A. Yes, if I had known it. Q. That would be a case in which you would stop a train? A. I would call up the dispatcher first and ask his instructions. Q. So, if Mr. Pritchard had notified you that there was a hose across the track at Aberdeen, you would have stopped that train? A. Yes, sir; I would have stopped it."

In passing upon the Court's ruling upon the first prayer of the defendant, we are not to consider the evidence offered with a view of ascertaining whether it is legally sufficient to establish the facts mentioned in the defendant's contention, but we are only to decide whether such evidence is of sufficient probative force to go to the jury to be considered by them in determining whether such facts exist.

There is found in this record evidence legally sufficient to go to the jury tending to show that sufficient water could have been obtained from the Adams plug to have extinguished the fire which had just caught to the Hanway building at the time the hose was cut, as testified to by a number of witnesses, one of them saying that at that time he could have put the fire out with two buckets of water.

There was also evidence legally sufficient to go to the jury tending to show that the plaintiffs were prevented by the cutting of the hose from getting sufficient water to extinguish the fire that was consuming their property. In this connection it may be said that even though water might have been obtained from unfrozen plugs upon the north side of the track, which were overlooked or not examined by those fighting the fire, such fact should not defeat the right of the plaintiffs to recover, when a number of plugs on that side of the track were found to be frozen from which they could not get a supply of water. At such times quick action is absolutely necessary in fighting a fire successfully and under the circumstances confronting them the firemen were not, we think, required to examine every plug upon the north side of the track to see if water in sufficient quantity could be ob-

tained therefrom before going across the track of defendant's road in search of water.

It is also our opinion that there was sufficient evidence to go to the jury tending to show that at least Pritchard, the defendant's agent at Aberdeen, had notice of the placing of the hose across the defendant's tracks. Appreciating the fact that the hose when so placed would be cut by some passing train unless some precaution was taken to prevent it, those in charge of the hose arranged to and in fact did send parties with red lanterns both up and down the road to flag the trains. They, however, to a great extent relaxed their supervision over these men when told by the station agent that it was unnecessary to send them as he had communicated with the men in the towers, one to the north and one to the south of the station, only a few miles away, of the fire in Aberdeen, warning them to have the trains stopped.

It is true Pritchard denied the fact that he told Mr. Strasbaugh or any one else that he had communicated with the men or either of them, but he admitted that Strasbaugh told him they were going to place the hose across the track, and that he talked with Strasbaugh about it; and upon cross-examination he stated that he told Strasbaugh that he would go to the station and notify those in the towers that the hose would be or had been placed across the track and he left Strasbaugh to do it. But he said he did not go direct to the station but "went up around about the hedge." Where else he went or how long it took him to reach the station, he did not say. He did say, however, that he went and talked with the man in the tower to have an engine sent to Aberdeen to remove a car on the switch at that point, and he was switched off to the dispatcher at Wilmington; that the car he asked for was there in five or six minutes from the time he despatched for it.

At the time Pritchard had his conversation with Strasbaugh, the hose had not yet been placed across the track. It thereafter was carried 300 feet to the fire at the Hanway

building before the water was turned on. After the water was turned on, it was found that the hose contained a leaky joint and this joint was removed and the hose was again connected with the plug and the water again turned on. It took some time to do these things, and as it required only a few minutes to notify those in the tower, these facts were legally sufficient to go to the jury as tending to show that the defendant's agent had notice of the presence of the hose across the track in time to stop the train before reaching the crossing where the hose was laid. Had Pritchard called up Bonnett, the man in the tower, he would have given the order for the train to stop, for he so stated in his cross-examination.

The defendant's second prayer required the jury to find that "the engineers of the defendants operating the passing trains were notified that the hose had been so placed across said tracks in time to stop the trains with safety" before they could find for the plaintiffs.

This instruction, which ignored the alleged notice to Pritchard, agent of the defendant, and confined the giving of the notice to the engineers of their respective trains, was properly refused.

Nor do we upon the facts disclosed by the record discover any error in the Court's ruling in refusing the defendant's third prayer.

The fourth prayer of the defendant was also properly refused. The instruction therein contained, that the verdict of the jury should be for the defendant if they found "no notice had been given to those charged with the management of the trains that said hose was across the defendant's property at that point (the crossing) in time to prevent said trains from passing over said hose, might well have misled the jury into believing that those referred to were those operating said trains only, or that it did not include Pritchard, who testified he had nothing to do with the management of the trains. The modification by the Court of the defendant's fifth prayer

was properly made; otherwise it might have misled the jury as pointed out by us in our discussion of the Court's ruling upon his fourth prayer.

The defendant's sixth prayer required the jury to find that negligence on the part of "the servants of the defendant *operating* the trains" caused said accident and if they failed to so find the verdict "must be for the defendant." This instruction too was wrong as it confined the negligence from which the accident resulted to *those operating the trains.*

The plaintiff's first prayer was properly granted. The special exceptions thereto raised the same questions as those presented by the objections urged against the refusal of the defendant's first prayer. The only other objection to the prayer to which our attention has been called is that it assumes, without requiring the jury to find, that the Adams Plug "was at the time of said connection the only fire plug in said town near Front street and Belair avenue which was not frozen up." The special exceptions of the defendant to the granting of this prayer do not go to the assumption of this fact, consequently the prayer cannot be held bad, under the general exception thereto, because of such alleged defect therein. Both special and general exceptions were taken to the rulings of the Court in granting the plaintiff's second and fifth prayers, but as the questions raised thereby have already been decided adversely to the appellant in passing upon other prayers in the case, we need only say that these prayers were properly granted.

In the trial of the case seventeen exceptions were taken to the rulings of the Court upon admission of evidence. The appellant does not in his brief discuss or even refer to any of these exceptions, and after careful consideration of them we discover no reversible errors committed by the Court in its rulings thereon.

In the first of these, the witnesses had already been permitted without objection to state the facts elicited by the question to which the exception was taken.

The second, third and fifth exceptions were taken to the admission of testimony offered on the part of the plaintiffs to show the value of the stock of goods at the time it was destroyed by fire. The evidence embraced in these exceptions was, we think, properly admitted for that purpose, and we find no error in the Court's ruling upon the fourth exception.

There can be no question as to the correctness of the Court's rulings upon the sixth and ninth exceptions permitting the witnesses Strasbaugh and Aaronson to state the conversation at the crossing between Strasbaugh and Pritchard, the agent of the defendant, for by such conversation it is shown that Pritchard not only knew of the intention of the parties to put the hose across the track, but in it he stated that he had taken precautions to prevent the hose from being cut by the trains of the defendant.

The answer to the question as to how the fire at Mr. Ivins' place was put out, to which the seventh exception was taken, could in no way have injured the defendant and the same can be said of the answer of the witnesses in the eighth and fourteenth exceptions.

The witness in the tenth exception was asked "would there be any reason for Mr. Pritchard telling you that he had notified the railroad except that he saw you were about to put a hose across the track and of sending a man each way to stop the train?" To which the witness replied "He did not see us putting the hose across the track at the time he told me."

In the eleventh exception the same witness was asked, "What was the necessity of sending men up and down the track except that you were going to stretch a hose across the track." He answered "for protection to keep the train from cutting the hose if a train came aong." These answers could in no way have injured the defendant.

In the twelfth exception the witness Bonnett was asked what reason could Mr. Pritchard have had in notifying you not to send men up and down the track with lanterns. His

answer was "I don't know what reason he would have for it." This, like the tenth and eleventh exceptions could not have harmed the defendant.

The evidence admitted under the thirteenth exception was properly admitted as reflecting upon the supply of water that was obtainable from the water supply system furnished by the town including the Adams plug.

The same can be said of the evidence admitted under the fifteenth and sixteenth exceptions.

In the seventeenth exception Frank Baker, a witness for the defendant, was asked "how was the heat in the vicinity of Mr. Hanway's store? A. It was the heat that set the building on fire." The plaintiff moved to strike out this answer, which motion was granted and the defendant excepted thereto.

The fact disclosed by this answer we think was immaterial and it could not in any way have benefited the defendant had it remained in.

Inasmuch as we find no reversible errors in the rulings of the Court the judgment will be affirmed.

*Judgment affirmed, with costs.*